**Oliver J. CLARK, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 89–700.**

District of Columbia Court of Appeals.

Argued Feb. 20, 1991.
Decided June 21, 1991.

---

Samia Fam, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Thomas J. Tourish, Jr., Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Kevin Ohlson, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN and SCHWELB, Associate Judges, and BELSON,* Associate Judge, Retired.

* Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on June 1, 1991.

SCHWELB, Associate Judge:

Oliver Clark was convicted by a jury of second-degree murder while armed, D.C. Code §§ 22–2403, –3202 (1989), and of two misdemeanor weapons offenses.[1] The charges were precipitated by the fatal shooting of Clark's long-term "girlfriend,"[2] Helen Harrison. Clark was sentenced to a prison term of no less than five and no more than twenty years for the homicide and to two one-year prison terms for the misdemeanors, all three sentences to run concurrently.

On appeal Clark contends, among other things, that the trial judge committed reversible error in admitting into evidence, over defense objection, testimony by prosecution witnesses regarding out-of-court statements allegedly made to them by the decedent regarding past acts of violence by Clark and threats said to have been directed at her by Clark. We agree with Clark that this evidence, which the trial judge admitted as relevant to the decedent's state of mind, was at most marginally germane to any genuine issue in the case. At the same time, the challenged testimony brought before the jury devastating hearsay evidence of alleged past bad acts which Clark was precluded from challenging through cross-examination. We hold that the prejudicial effect of this evidence substantially outweighed its minimal probative value. Accordingly, we reverse Clark's murder conviction and remand the case for a new trial.

I

THE EVIDENCE

The trial of this case lasted four days, and the testimony was extensive. We recount only that part of the evidence which we view as relevant to our disposition of this appeal.

A. *The events of November 7, 1987.*

During their twelve-year romantic relationship, Oliver Clark and Helen Harrison both apparently abused alcohol with some frequency. They often quarreled, and prosecution witnesses claimed at trial that Clark bullied and mistreated Ms. Harrison verbally and sometimes physically. Although the events which precipitated Ms. Harrison's death were sharply contested during the trial, it appears that the couple's drinking and bickering produced the tragic confrontation which ended Ms. Harrison's life and jeopardized Clark's liberty.

On the evening of November 7, 1987, in the bedroom of the apartment which she shared with Clark, Helen Harrison died instantaneously from a single gunshot wound to her head. The bullet entered the right side of her head and came out from the left side. The controversy at trial centered upon the events that immediately preceded the shooting and, especially, on Clark's state of mind.

The government claimed that Clark became angry because Ms. Harrison was "messing" with him, and that he shot her deliberately and with malice aforethought. Clark agreed that Ms. Harrison had been "messing" with him, but he contended that the shooting was accidental and that it occurred after Ms. Harrison, who had been drinking and had a "strange" look in her eyes, pointed a pistol at him. He testified that he attempted to disarm her and that the weapon discharged during the struggle. The government countered that Clark's version at trial was contrived after the fact, and that on the evening in question Clark had failed to mention to his daughter, to his former wife, to the police dispatcher to whom the incident was reported, or to the police officers who came to investigate, that Ms. Harrison had been in possession of the pistol or had pointed it at him. According to the prosecution witnesses, Clark's contemporaneous version had been that Ms. Harrison had "messed" with

---

1. The two offenses were possession of an unregistered firearm, D.C.Code § 6–2311(a) (1989) and unlawful possession of ammunition for an unregistered firearm, *id.* § 6–2361(3).

2. Clark was forty-eight years old at the time of Ms. Harrison's death and Ms. Harrison was of approximately the same age.

him, that he did not know the pistol was "cocked," and that he had merely wanted to frighten her. A police officer also testified that Clark said on the scene that he was "guilty."

### B. Other evidence.

Apparently recognizing that the past is prologue, the government attempted to place the events of November 7, 1987 in perspective by illuminating the history of the relationship between Clark and Ms. Harrison. Some of the prosecution evidence regarding past events consisted of testimony by witnesses who had personally observed those events; the defense conceded the competence of this evidence, but objected to its admission on the ground that it constituted impermissible evidence of the defendant's bad character. The prosecution also presented testimony by several witnesses regarding statements allegedly made to them by Ms. Harrison regarding Clark's conduct towards her; the defense contended that this evidence was inadmissible not only on the previously stated ground, but also because it was hearsay.

Several witnesses, including Clark's daughter, Elaine Clark Hicks, and his former wife, Eleanor Clark, testified that Clark had a severe drinking problem, drank every day, and acted in an aggressive and violent manner when under the influence of alcohol. Ms. Hicks also testified that in 1977 or 1978, she was present when Clark hit and kicked Ms. Harrison and that, on other occasions, she had seen Ms. Harrison with a black eye and a swollen face. Alice Jones, Ms. Harrison's aunt, testified that she had likewise seen Ms. Harrison several times with a black eye and with other facial injuries.

Ms. Hicks testified that she had asked Clark about Ms. Harrison's injuries, and that Clark told her that Ms. Harrison "got what she deserved" because she "kept bothering him." Ms. Jones related that she made similar inquiries, and that Clark responded that Ms. Harrison "runs off at the mouth."

Ms. Jones never personally observed any abuse of her niece by Clark. She was, however, permitted over objection to testify to statements which Ms. Harrison had made to her on the subject. Specifically, Ms. Jones stated that approximately five years before her death, Ms. Harrison told her on two separate occasions, in response to her inquiries, that Clark had beaten her and inflicted injuries (a black eye and a bruised jaw) which were visible to Ms. Jones.

Sheila Harrison, Helen Harrison's daughter, lived with her mother and Clark in 1985. Like other witnesses familiar with the couple, Sheila Harrison observed both of them drink and argue. The daughter testified that in 1987, her mother telephoned her and told her that Clark wanted to kill her (the mother).

Officer Stuart Smith of the Metropolitan Police Department also appeared as a prosecution witness. Officer Smith testified that on July 23, 1980, he responded to Clark's apartment, where he spoke to Helen Harrison. Ms. Harrison was upset and distraught. According to Officer Smith,

[Ms. Harrison] said that Clark had threatened her life and that she was very concerned about this because it was part of a pattern of abuse that had gone on for some time—[an objection was made and overruled]. She ... was saying that "not only has he threatened me, but because he has beaten me and harmed me physically in the past," ... that's why I believe this.

The defense moved for a mistrial following Officer Smith's testimony, but the judge denied the motion. The judge instructed the jury, however, that statements allegedly made by Ms. Harrison to the witnesses could be considered only for the purpose of proving her state of mind on November 7, 1987, and not as proof of the facts asserted.

## II

### LEGAL DISCUSSION

#### A. The decedent's out-of-court statements.

■ Clark contends that the testimony of prosecution witnesses regarding Ms.

Harrison's alleged statements to them describing Clark's past abuse of her ought not to have been received in evidence. We agree. The purported issue to which the trial judge deemed the testimony relevant —Ms. Harrison's state of mind on the night of the homicide—was at most a marginal one, and the challenged evidence did not significantly illuminate it. The potential for prejudice, on the other hand, was substantial, for the out-of-court accusations by Ms. Harrison, if credited, tended to establish a pattern of intense mistreatment over a period of many years and thus to cast grave doubt on Clark's defense of accident. Clark, of course, had no opportunity to cross-examine Ms. Harrison regarding the events which she allegedly related to the prosecution witnesses.

The notion that Ms. Harrison's out-of-court statements were admissible to cast light on her own state of mind emerged rather late in the case. On October 6, 1988, the government filed a pretrial motion seeking admission of evidence of prior crimes. In its motion, the government proffered not only incidents which had been observed by prosecution witnesses, but also statements made by the decedent to those witnesses. Although these two kinds of proposed testimony present discrete types of evidentiary problems—proof of the events observed by witnesses would be competent, but could be attacked as "other crimes" evidence subject to the strictures of *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), while Ms. Harrison's out-of-court statements also raised obvious hearsay issues—the prosecution's motion made no attempt to differentiate between the two and did not discuss the hearsay issue at all.[3] Both in its pretrial motion and at trial, the government insisted that the decedent's out-of-court statements were admissible to prove Clark's state of mind, *i.e.* that he killed Ms. Harrison with malice and with a bad motive, rather than by accident.

Although he originally agreed with the government's theory, see note 3 *supra*, the judge eventually rejected it and, instead, ruled as follows:

The defense here is accident and the defendant has stated at the time that this was an accident, "[s]he messed with me, I didn't realize the gun was loaded, but I shot her." And it seems to me that incidents of abuse in the past by the defendant particularly when he was drinking as on this occasion *would tend to show that Helen's state of mind was such that she would not have messed with this defendant on the date in question* and hence, this was not an accident and I believe it is limited to just that, and that's the ruling of the court.

(Emphasis added).

The predicate for the admission of the evidence, then, was the judge's apparent belief that the prosecution was contending that, contrary to Clark's account, Ms. Harrison had not been "messing" with him. Our review of the record, however, persuades us that the government did not make any such contention and, on the contrary, depicted Ms. Harrison's "cantankerous goading"[4] as the motive for the crime. Indeed, the prosecutor argued in closing as follows:

There were three witnesses the defendant talked to on the night of the shooting and he said that Helen was messing with me. *We think it's a fair inference, ladies and gentleman, that she probably was.* She may have been pestering with him. She may have nagged at him. There was some sort of an altercation there, and as the defendant himself told you, when that happened he got angry.

(Emphasis added). The prosecutor continued:

If this was truly an accident, *why would he say*, ladies and gentlemen, I was lying on sofa, *she was messing with me? That suggests, ladies and gentlemen,*

---

3. Indeed, at trial, the judge initially accepted this undifferentiated approach. He remarked that "obviously ... much of it is hearsay, that's why you have the *Drew* exception. That's why

you have the *Drew* exception under certain circumstances."

4. This phrase is taken from the defense brief on appeal.

*that he got angry and took some deliberate action.*

(Emphasis added). According to the prosecutor, Ms. Harrison's pestering and nagging was "why the killing occurred."

The government argues on appeal that, although Ms. Harrison may have "verbally" messed with Clark, her out-of-court statements tended to establish that she was afraid of him and dominated by him and therefore would not have pointed a handgun at him. This was not an argument which the prosecutor made at trial,[5] nor was it the basis upon which the trial judge admitted the evidence. But even assuming that the government's theory is correct, and that the "level" of pestering in which the decedent engaged was at issue between the parties, the degree to which Ms. Harrison's out-of-court accusations could illuminate this question was surely marginal at best. If her accusations were true, and if Ms. Harrison had indeed been forced by Clark to endure years of torment, it is equally plausible to infer that, with her resistance reinforced by alcohol,[6] she took possession of the handgun as a means of demonstrating that she would not put up with the abuse any more.

"The state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant ... if that is at issue in the case." *Rink v. United States*, 388 A.2d 52, 57 (D.C.1978) (quoting *United States v. Brown*, 160 U.S.App.D.C. 190, 194, 490 F.2d 758, 762 (1973)); *see also Clark v. United States*, 412 A.2d 21, 25 (D.C.1980). "Where the defendant in a murder case has raised a defense of accident, suicide, or self-defense, the victim's mind is of particular concern to the jury." *Clark, supra,* 412 A.2d at 25. A statement by the decedent that she was afraid of the defendant, or that the defendant has threatened her, may therefore be admissible if the decedent's state of mind is at issue. *Id.* As we noted in *Clark,* however,

[t]his type of statement ... also includes the allegation of an act which has not been proven by competent evidence. The danger is that the jury, even with a proper limiting instruction, may be unable to use the statement as evidence of the declarant's state of mind without also erroneously concluding that the incident related in the statement has been proven to have occurred.

*Id.*

In *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), the defendant had been convicted of murder in the poisoning death of his wife. The wife's nurse testified that her patient had told her "Dr. Shepard has poisoned me." The prosecution claimed that this evidence tended to show that the decedent had the will to live, and thus rebutted Shepard's claim that his wife had committed suicide. In reversing Shepard's conviction, the Court, speaking through Justice Cardozo, said:

It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to someone else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out.

*Id.* at 104, 54 S.Ct. at 25–26; *accord Clark, supra,* 412 A.2d at 25 n. 5 (quoting from *Shepard* ).

Given the obvious risk of prejudice which evidence such as that here at issue invites, trial courts should exercise considerable caution in determining whether it should be

---

5. As Clark points out in his reply brief, "the government cannot point to a single page of the transcript where the prosecutor even hinted at such an argument."

6. Ms. Harrison's blood alcohol level was .31, more than three times the legal intoxication level for the operation of a motor vehicle. *See* D.C.Code § 40–502(a) (1990).

received. We have held in the somewhat analogous context of the use of "other crimes" evidence to prove the defendant's intent that "the trial judge must first determine whether a genuine and material issue has been raised with respect to which [other crimes] evidence is relevant." *Thompson v. United States*, 546 A.2d 414, 420 (D.C.1988). If no such issue is presented, then the probative significance of the evidence is necessarily reduced, with obvious consequences for the balancing of probative value against prejudicial effect. We added in *Thompson* that the judge must "view with a jaundiced eye"

> evidence purportedly offered as relevant to some other issue but in reality bearing wholly or primarily on the defendant's predisposition to commit another similar crime.

*Id.*

■ With specific reference to the problem presented in this case, we have emphasized that

> the deceased declarant's extra-judicial statements of fear may be admitted under this exception only if the declarant's, not the appellant's state of mind is a relevant issue.

*Fox v. United States*, 421 A.2d 9, 11–12 (D.C.1980). There was no meaningful dispute at trial as to Ms. Harrison's state of mind. The evidence was therefore far more prejudicial than probative. Accordingly, it should not have been received.[7]

### B. Harmless error analysis.

According to the government, any error in admission of Ms. Harrison's out-of-court statements "would certainly be harmless because her recitations regarding appellant's prior violent acts were merely cumulative to other, properly admitted, evidence." We do not agree.

■ To warrant a holding that trial court error is harmless, the court must be satisfied "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *Thomas v. United States*, 557 A.2d 1296, 1303 (D.C.1989). The Supreme Court's choice of the words "fair assurance" precludes us from affirming on a mere hunch that the case would have ended with the same verdict if the erroneous ruling had not been made. To conclude that an error is harmless, we must find it "highly probable that [that] error did not contribute to the verdict." *United States v. Tussa*, 816 F.2d 58, 67 (2d Cir.1987) (quoting *United States v. Corey*, 566 F.2d 429, 432 (2d Cir.1977)). Harmless error analysis "should not be limited to superficial inquiry as to whether the same verdict would have been possible absent the tainted evidence." *Brooks v. United States*, 367 A.2d 1297, 1309 (D.C.1976).[8] In

7. The determination whether the probative value of proffered evidence is sufficient to outweigh its prejudicial effect is committed to the sound discretion of the trial court. *United States v. Mosby*, 495 A.2d 304, 305 (D.C.1985); *see also Roundtree v. United States*, 581 A.2d 315, 328 (D.C.1990) (describing the trial court's evidentiary determination as to relevancy as "highly discretionary"). As we stated in *Johnson v. United States*, 398 A.2d 354, 364 (D.C. 1979), however, "[a]n informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation." In the present case, the judge's exercise of discretion was predicated upon an apparent misapprehension with regard to the government's position. Contrary to the judge's observation, the government was not contesting Clark's claim that the decedent had been "messing" with him.

8. As the always quotable and insightful Judge Irving Goldberg wrote for the court in *Chapman v. United States*, 547 F.2d 1240, 1250 (5th Cir.), cert. denied, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977),

> [t]he infusion of 'harmlessness' into error must be the exception, and the doctrine must be sparingly employed. A minuscule error must coalesce with gargantuan guilt, even where the accused displays an imagination of Pantagruelian dimensions.

Pantagruel, the hero of a 1526 novel by Francois Rabelais, was the gigantic son of Gargantua. Assuming, as we do, that Judge Goldberg's tongue was not so terribly far from his cheek when he resorted to Rabelais—and we are confident that the judge was not purporting to overrule or supplant *Kotteakos* even by implication—he apparently thought, and so do we, that the evidence of guilt has to be pretty strong before significant trial error may properly be

determining whether error was harmless, we must look to the closeness of the case, the centrality of the issue affected by the error, and any steps taken to mitigate the effects of the error. *Gaither v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969).

█ Whether the present case was a close one is difficult to assess, especially from our sheltered appellate perch. Clark was the only person present at the fatal encounter who lived to tell of it. The burden was on the prosecution to disprove self-defense beyond a reasonable doubt. Clark's testimony was substantially impeached on cross-examination, and the jury could reasonably have believed that his account at trial differed in critical respects from his earlier descriptions of what had occurred. Indeed, his initial version—that he only wanted to frighten the decedent and that he did not know that the pistol was cocked—is difficult to reconcile with his trial testimony that Ms. Harrison was threatening him with the weapon, that he warned her that it was dangerous, and that the shooting was accidental. The evidence against Clark regarding the events of the fatal evening, in our view, was neither marginal nor overwhelming, but somewhere in between.

The issue to which the error related was an important one. In light of Clark's defense of accident, his state of mind was critical. His past relationship with the decedent provided the principal source of available information regarding that state of mind. There was evidence of Clark's prior abuse of Ms. Harrison to which prosecution witnesses testified from personal knowledge, or from Clark's extrajudicial statements to them, but it was comparatively sketchy.[9] There was no non-hearsay evidence that Clark "wanted to kill" Ms.

Harrison, as her daughter testified, or that he had threatened her life. The hearsay related by Officer Smith, Ms. Jones and Ms. Harrison on the other hand, combined to depict a long relationship characterized by repeated violence and threats from Clark which caused Ms. Harrison to fear for her life. At least potentially, and perhaps actually in light of the jury's verdict, the hearsay could have had a pronounced and even devastating impact on Clark's defense of accident.

█ Turning to the question of mitigating steps, we have noted that the judge instructed the jury that Ms. Harrison's out-of-court statements were to be considered solely for the purpose of proving Ms. Harrison's state of mind, and not for their truth. Jurors are, of course, presumed to obey the court's instructions, *Owens v. United States*, 497 A.2d 1086, 1092 n. 7 (D.C.1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986), but we have recognized that this doctrine has its limits, for no juror, no matter how conscientious, can do the impossible. *See, e.g., Thompson, supra*, 546 A.2d at 424–25.[10]

We conclude that in the present case, these limits have been reached. As Judge Harris wrote for the court in *Giles v. United States*, 432 A.2d 739, 746 (D.C.1981), in explaining why hearsay evidence of a defendant's past bad acts may not alone be used to establish that his victim was afraid,

> the jury in effect must believe that the past act occurred in order to infer that the deceased was in fear. In other words, the hearsay must be accepted for its truth if it is to provide a basis for evaluating the declarant's state of mind. Hearsay evidence which is otherwise inadmissible cannot be bootstrapped to a

---

found to be harmless. Nevertheless, Chapman's conviction was affirmed.

**9.** Ms. Hicks was the only witness who testified that she observed assaultive conduct by Clark against Ms. Harrison, and the incident which she described occurred more than ten years before Ms. Harrison's death. Not all of Ms. Hicks' testimony was unfavorable to her father's position; she also stated that on her last visit to

her father and Ms. Harrison in 1987 the couple had appeared to be "in love." Ms. Jones testified that Clark had admitted cracking Ms. Harrison's lip, but this too had occurred several years earlier.

**10.** "There is empirical support for the proposition that limiting instructions about other crimes are less than uniformly efficacious." *Thompson, supra*, 546 A.2d at 425.

recognized hearsay exception in this manner.

In the present case, as in *Shepard, supra*, 290 U.S. at 106, 54 S.Ct. at 26, the hearsay testimony "spoke to a past act,[11] and more than that, to an act by someone not the speaker. Other tendency, if it had any, was a filament too fine to be disentangled by a jury." Here, as in *Campbell v. United States*, 391 A.2d 283, 288 (D.C. 1978), we cannot say with "fair assurance" or with "sufficient certainty" that the evidence which was properly admitted was "so overwhelming" that Clark was not impermissibly or unduly prejudiced. The error was not harmless.[12]

## III

## OTHER ISSUES

In light of our holding that the admission of the decedent's statements to prosecution witnesses constituted reversible error, Clark is entitled to a new trial. We briefly address those of Clark's remaining claims of error which are likely to arise if and when the case is tried again.

### A. *Defendant's theory of the case.*

At trial, Clark requested a detailed jury instruction on his theory of the case which would have explicated his defense of accident in the context of his right of self-defense. The judge offered to give the jury the "redbook" instructions on self-defense,

but Clark did not accept that offer, arguing that self-defense presupposes an intentional homicide rather than an accidental one. The judge declined to give the instruction requested by the defense, but instructed the jury as follows:

> The defendant's theory of the case is that Helen Harrison pointed the gun at him and that it discharged accidentally as he tried to take the gun from her and deflect it from himself. *If you are satisfied that this is what happened,* you must find that the defendant is not responsible for the death of Helen Harrison.

(Emphasis added).

■■■ The defense contends, the government effectively concedes,[13] and we now hold that the italicized language was erroneous, for the prosecution had the burden of proving beyond a reasonable doubt that the killing was not accidental,[14] whereas the judge implied in the improvised instruction that the defense had to satisfy the jury to the contrary. We also agree with Clark that he was entitled to an instruction as to his theory of the case along the general lines that he proposed at trial. As the court explained in *Braxton v. Commonwealth*, 195 Va. 275, 278, 77 S.E.2d 840, 841–42 (1953) (quoting *Valentine v. Commonwealth*, 187 Va. 946, 952–53, 48 S.E.2d 264, 267–68 (1948) (quoting 40 C.J.S. *Homicide* § 112c, at 981)),

---

**11.** Actually, past and evil acts in the plural.

**12.** We have also found instructional error on this record, see pp. 194–195, *infra*, a holding which compounds the difficulties with the government's claim of harmlessness. We emphasize that this is not a case like *Lemon v. United States*, 564 A.2d 1368 (D.C.1989), in which the prosecutor made impermissible remarks to the jury, but where we found no reversible error because the matters to which he alluded "would have been obvious to the jury no matter what the prosecutor said." *Id.* at 1376. In the present case, but for the improperly admitted hearsay, the jurors would never have learned of the prejudicial out-of-court statements which the decedent was alleged to have made.

**13.** The government contends, however, that Clark did not adequately preserve the issue

whether the italicized language from the judge's instruction shifted the burden of proof. We need not and do not decide the point.

**14.** "The overwhelming weight of authority in [jurisdictions which have not resolved the question by statute] is that when the defense is raised that the homicide in question occurred by accident or misadventure, the prosecution is required to prove beyond a reasonable doubt that the killing was intentional or not accidental...." Annotation, *Homicide: Burden of Proof on Defense that Killing was Accidental,* 63 A.L.R.3d 936, 941 (1975); *see also Stambaugh v. State,* 30 Md.App. 707, 710–11, 353 A.2d 638, 641 (1976); *Commonwealth v. Zezima,* 387 Mass. 748, 756–57, 443 N.E.2d 1282, 1287 (1982); Criminal Jury Instructions for the District of Columbia Nos. 4.25 and 4.26 (3d ed. 1978).

[o]rdinarily the law of self-defense is not applicable in a case of a killing resulting from an act which was accidental and unintentional, particularly where the facts of the case are not such as would make such law applicable. However, where the defense of excusable homicide by misadventure is relied on, the principles of self-defense may be involved, not for the purpose of establishing defense of self, but for the purpose of determining whether accused was or was not at the time engaged in a lawful act; and it has been held that in such case the right, but not the law, of self-defense is invoked. Accused is entitled to an acquittal where he was lawfully acting in self-defense and the death of his assailant resulted from accident or misadventure, as where in falling he struck or overturned an object and thereby received injuries resulting in his death, or where in a struggle over the possession of a weapon it was accidentally discharged.

*Accord, Curry v. State*, 148 Ga. 559, 561–65, 97 S.E. 529, 530–31 (1918).[15]

### B. Clark's past bad conduct and alcohol abuse.

 Clark's proffered defense was that Ms. Harrison's death was an accident. Since there was testimony that Clark had been drinking on the evening in question, evidence of his conduct while abusing alcohol was relevant to rebut that defense, and fell within the specific *"Drew"* exception for "the absence of mistake or accident." 118 U.S.App.D.C. at 16, 331 F.2d at 90.

Accident being the central issue, the trial judge could reasonably conclude that such evidence was more probative than prejudicial.[16]

The competent non-hearsay testimony tending to show that Clark had abused Ms. Harrison in the past was demonstrably relevant. Context is often all-important. As the Supreme Court explained in *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416 n. 6, 80 S.Ct. 822, 826 n. 6, 4 L.Ed.2d 832 (1960) (quoting *Axelson Mfg. Co.*, 88 N.L. R.B. 761, 766 (1950)),

> [e]vents obscure, ambiguous, or even meaningless when viewed in isolation may, like the component parts of an equation, become clear, definitive, and informative when considered in relation to other action. Conduct, like language, takes its meaning from the circumstances in which it occurs.

An attempt to restrict the evidence in a case of this kind to the events of the fatal evening would unreasonably cramp the inquiry, to the detriment of the search for truth. This is particularly true where, as here, the voice of the other participant in the encounter has been forever stilled, so that the only available account was provided by the witness whose stake in the outcome was obvious.

 "[T]he conduct, attitude, and feelings of the accused and the deceased toward each other may be shown in a murder case to establish motive, malice, or intent." *Gezmu v. United States*, 375 A.2d 520, 522 (D.C.1977) (per curiam).

15. We express no opinion as to whether the instructional error, standing alone, would have required reversal. Obviously, however, the failure to instruct the jury in a sufficiently comprehensive manner on the defendant's theory of the case compounded the improper admission of hearsay evidence.

16. We do not think that *Burrell v. United States*, 455 A.2d 1373 (D.C.1983), in which this court held that certain evidence about the appellant's drinking habits and character was improperly admitted, controls this case. In *Burrell*, the defendant claimed self-defense, not accident, and the principal issue to which the evidence here challenged is relevant—namely, lack of accident—was not presented in *Burrell*. If what Clark did on the fatal night was similar to what

he did habitually when drunk, or drinking, the plausibility of the defense of accident is at least in some measure undermined. Moreover the prosecutor's basic approach in *Burrell* was to create a "bad man—good man" dichotomy between the defendant and the decedent. The record in the present case, on the other hand, is replete with allusions to Ms. Harrison's own drinking problem and to her argumentative conduct while abusing alcohol.

We agree with Clark, however, that the testimony of his former wife that Clark became quarrelsome while drinking when the couple were married more than twenty years earlier had little or no relevance to the relationship between Clark and Ms. Harrison, and its reception in evidence was questionable.

Moreover, the relationship between the defendant and the decedent was marital or quasi-marital in nature and, as this court stated in *Gezmu, supra,* 375 A.2d at 522 (quoting *Romero v. People,* 170 Colo. 234, 242, 460 P.2d 784, 788 (1969)),

> [i]n marital homicide cases any fact or circumstance relating to ill-feeling; ill-treatment; jealousy; prior assaults; personal violence; threats, or any similar conduct or attitude by the husband toward the wife are relevant to show *motive* and *malice* in such crimes.

(Emphasis in original).[17] We therefore hold that the nonhearsay evidence was properly admitted.[18]

### C. The denial of Clark's motion to suppress tangible evidence.

Shortly after he shot Ms. Harrison, Clark called his daughter, Elaine Hicks, and reported that "I have just killed Helen." Ms. Hicks, her mother and her mother's friend promptly came to Clark's apartment. Within minutes of their arrival, Mrs. Clark telephoned the police and reported an accidental death. Clark also spoke with the dispatcher during the initial call.

Police officers arrived at the apartment at approximately 9:50 p.m. Officer Cole walked into the bedroom where the shooting had occurred and observed in plain view the decedent's body, a handgun (later identified as the weapon with which the decedent was shot) and an ammunition clip containing an unspent bullet. One of the officers asked what had happened, and Clark responded that he was "guilty." Clark was arrested and transported to the police station.

At approximately 10:20 p.m., a police evidence technician arrived at the apartment. He observed the body, the handgun and the clip, and he also located a slug which was lying on the floor.[19] He seized the weapon, clip, and slug and photographed the body and the scene. He also prepared a diagram.

At 11:05 p.m., the officers were notified that Clark had signed a written consent to the search of his apartment.[20] A thorough search was conducted, but no additional evidence was seized.

Clark filed a motion to suppress the tangible evidence against him, all of which was seized prior to his execution of the consent, and all of which was discovered in plain view. After an extensive evidentiary hearing, the trial judge denied the motion, observing that "all the crime scene search officer did was to merely do that which the first officer could have done if he had the material with him when he walked into the room."

■■■ The scope and duration of a warrantless search must be circumscribed by the exigencies which justify its initiation. *Horton v. California,* — U.S. —, 110 S.Ct. 2301, 2309, 110 L.Ed.2d 112 (1990). Clark maintains that this requirement has not been satisfied. He acknowledges that the initial entry by the police was justified by the need to respond to an "emergency situation" in order to ascertain whether anyone was in need of immediate aid or whether a killer remained on the premises. *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). He also concedes that "the

---

17. We reiterate, however, that *Gezmu* may not be read as creating a "marital homicide" exception to the hearsay rule. *Clark, supra,* 412 A.2d at 27; and see discussion at pages 191–192, *supra.*

18. We also hold that in light of the defense testimony, the door was opened to the rebuttal evidence adduced by the prosecution in relation to Clark's ownership of and association with the handgun with which Ms. Harrison was shot. *Curry v. United States,* 322 A.2d 268, 269 (D.C. 1974); *see also Johnson v. United States,* 373 A.2d 596, 598 (D.C.1977).

19. This slug was later identified as the round which killed Ms. Harrison.

20. The parties have not raised, and we do not address, the question whether under all of the circumstances, including his participation in the notification to police, and the lack of any objection on his part to the officers' activities, Clark would properly be deemed to have consented to the seizure, well before he signed the written document, at least of items in plain view. *See* 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.5(e), at 692–93 (2d ed. 1987); *State v. Fredette,* 411 A.2d 65, 69 (Me. 1979).

police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Id.* at 393, 98 S.Ct. at 2413; citing *Michigan v. Tyler,* 436 U.S. 499, 509–10, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978). In *Thompson v. Louisiana,* 469 U.S. 17, 22, 105 S.Ct. 409, 412, 83 L.Ed.2d 246 (1984) (per curiam), a decision on which Clark places heavy reliance, the Court reiterated that police officers who enter a dwelling after having been requested to respond to an emergency would be "justified ... in seizing evidence under the plain-view doctrine while they were in petitioner's house to offer her assistance." We think that the seizure in this case was permissible under *Tyler, Mincey* and *Thompson.*

In *Tyler,* firefighters entered a building and extinguished a fire. Several hours later, they returned and seized evidence inculpating the defendant. No warrant had been secured. The Court rejected the apparent view of the Supreme Court of Michigan that "the exigency justifying a warrantless entry to fight a fire ends, and the need to get a warrant begins, with the dousing of the last flame." *Tyler, supra,* 436 U.S. at 510, 98 S.Ct. at 1950. Noting that fire officials are charged "not only with extinguishing fires but with finding their causes," and that immediate investigation may be necessary to preserve evidence, the Court held that "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." *Id.* Although police officers and fire fighters do not have identical responsibilities,[21] it is significant that in *Mincey* the Court cited *Tyler* as authority for the proposition that police may seize without a warrant items which are in plain view during an emergency.

Clark relies on *Douglas–Bey v. United States,* 490 A.2d 1137 (D.C.1985). In that case, Officer Hennessy monitored a police radio broadcast reporting a shooting at a four-unit apartment complex. When he arrived at the building, he observed from the hallway, through an open apartment door, a black sandal, a set of false teeth and a pool of blood, all located in one of the apartments. He entered the apartment and saw signs of a struggle. A blood-soaked athletic bag was in plain view. After a brief check to determine if a victim or suspect was present, Hennessy left but called for a crime scene search officer. Subsequently, two police lieutenants entered the apartment, soon to be followed by the crime scene search officer. The latter seized certain physical evidence, including bullets which Hennessy had not seen, and photographed other items, including bullet holes and bullet markings.

The trial judge denied Douglas–Bey's motion to suppress physical evidence. On appeal, however, this court reversed. Recognizing that Hennessy would have had the right to seize those items which he saw in plain view under the "emergency search" exception to the warrant requirement, 490 A.2d at 1138, the court nevertheless rejected both the government's contention that the second and third entries were justified under that exception and its alternative argument that the crime scene search officer was Hennessy's "alter ego" for purposes of the seizure of the evidence. *Id.* at 1138–39.

There are two principal differences between *Douglas–Bey* and the present case. First, the court noted in *Douglas–Bey* that Hennessy did not see bullets, bullet holes or bullet markings, which were apparently a principal focus of the suppression motion; in the present case, Officer Cole saw the pistol and the clip (although, as we note below, he did not notice the slug). Second, in *Douglas–Bey,* officers made a second entry into the apartment after Hennessy had left; here, the officers who had responded to the call regarding the death of the decedent, and who had made a con-

---

**21.** As the Court pointed out in *Tyler,* however, "there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime ...". 436 U.S. at 506, 98 S.Ct. at 1948.

cededly legal emergency entry, were still on the scene when the crime scene search officer arrived, seized and photographed evidence, and drew diagrams.[22]

■ In *Tyler*, the Supreme Court upheld a warrantless seizure from the premises where the fire occurred even though the firefighters left after extinguishing the flames at about 4 a.m. and returned in daylight a few hours later. Rejecting the notion that their departure had the effect of ending the emergency, the Court remarked that "[l]ittle purpose would have been served by their remaining in the building, *except to remove any doubt about the legality of the warrantless search and seizure later that morning*." 436 U.S. at 511, 98 S.Ct. at 1951 (emphasis added). The underscored language suggests that where, as in the present case, the responding officers remained on the premises for a reasonable time and were still there when the crime scene search officer seized the items in plain view, the legality of the seizure cannot reasonably be questioned.[23]

The government relies on *Brooks v. United States*, 367 A.2d 1297, 1311 (D.C. 1976). We there held that evidence which was discovered in plain view during an emergency warrantless entry may properly be seized thereafter without a warrant. Clark does not vigorously argue that *Brooks* is distinguishable from the present case, but claims that *Brooks* is inconsistent with the Supreme Court's subsequent decisions in *Mincey* and *Thompson* and is therefore no longer good law. *Brooks* was not cited or discussed in *Douglas–Bey*, and it may be fair to say that the opinions of the court in the two cases, if reconcilable with one another at all, are not in perfect spiritual harmony. Arguably, *Brooks* is more compatible than *Douglas–Bey* is with the Supreme Court's approach in *Tyler*, which approach was apparently reaffirmed in *Mincey*.[24] *See also* W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.5(e), at 694–96 (2d ed. 1987) (collecting authorities which permit warrantless seizure of items in plain view at the scene of a homicide).

A holding that even though Officer Cole had the right to seize the pistol, clip and slug[25] and to photograph the scene, his colleague acted unlawfully in doing so would improvidently exalt form over substance. If we were to adopt Clark's posi-

---

**22.** This difference was decisive for at least one member of the *Douglas–Bey* panel. According to him, "Hennessy could have stayed on the scene for the short period it took the others to arrive, thus not triggering the warrant clause of the Fourth Amendment." 490 A.2d at 1140 (Nebeker, J., concurring).

**23.** The court in *Douglas–Bey* dealt with *Tyler* as follows:

"The government also urges that *Michigan v. Tyler* ... is controlling. We disagree."

The opinion contains no further elaboration.

**24.** Neither *Brooks* nor *Douglas–Bey* has been overruled, and both decisions are protected by the doctrine of *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971). We are satisfied that our disposition of the present case runs afoul of neither precedent. If any further clarification is appropriate, it should be effected by the court sitting *en banc*.

**25.** We note, *sua sponte*, that the slug presents a more difficult question. Although it was evidently in plain view when Officer Cole arrived on the scene, he neither saw nor seized it at that time. There is language in *Douglas–Bey* which at least implies that items which the officer did not see initially cannot be seized later without a warrant. 490 A.2d at 1138. In *Tyler*, on the other hand, the firefighters seized in daylight on the morning following the fire evidence which they could not see during their initial entry "because of the heat, steam and darkness." 436 U.S. at 502, 98 S.Ct. at 1946. This warrantless seizure was upheld by the Supreme Court.

In the present case, Clark did not differentiate in his motion or on this appeal between the pistol and the clip (which Officer Cole saw) and the slug (which he did not notice even though it was in plain view). The distinction for present purposes between what was seen on the one hand, and what was there to be seen, but was not observed, on the other, is not crisply presented to us for decision. This is not surprising, for there is no question that the pistol was fired, and it would be of little solace to Clark to win suppression of the slug if the pistol and clip were introduced into evidence.

For this reason, and because it may be difficult to reconcile all of the authorities, we are not disposed *sua sponte* to explore the pros and cons of an argument which lurks in the record but has not been presented to us. We are satisfied that Clark is not appreciably prejudiced by our disposition, for the slug appears to be of minimal significance in relation to the evidence taken as a whole.

tion, the result would appear to turn on fortuities such as whether a crime scene search officer happened to be in Officer Cole's patrol car or otherwise immediately available. We decline to extend *Douglas–Bey* to reach so unrealistic a result. Accordingly, we hold that Clark's motion to suppress evidence was properly denied.[26]

## IV

## CONCLUSION

For the foregoing reasons, Clark's murder conviction is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion. We conclude that the trial errors relating to the admission of evidence and the court's instructions to the jury were harmless with respect to Clark's convictions for unlawful possession of an unregistered firearm and of unlawful possession of ammunition for that firearm, and each of those convictions is affirmed.

*So ordered.*

---

[26]. Clark also relies on *Commonwealth v. Lewin,* 407 Mass. 617, 555 N.E.2d 551 (1990). The differences between that case and the present one are aptly described in the following passage from the Supreme Judicial Court's opinion:

> Here, as in the *Mincey* and *Thompson* cases, teams of investigators arrived after a protective search had been completed, remaining on the premises to examine cupboards, probe closets, pry floorboards, dismantle doors, and remove numerous items including a door buzzer plate. Although the judge characterized the over-all situation as a "crime scene investigation," it was in fact and law a general search....

407 Mass. at 626, 555 N.E.2d at 556. In the present case, police seized only items in plain view prior to receiving Clark's consent; the comprehensive search was conducted thereafter.