# Richmond

## WINNIE VALENTINE V. COMMONWEALTH OF VIRGINIA.

June 14, 1948.

Record No. 3379.

Present, All the Justices.

The opinion states the case.

*Edward S. Ferebee*, for the plaintiff in error.

*Ballard Baker, Special Assistant to the Attorney General*, for the Commonwealth.

MILLER, J., delivered the opinion of the court.

On the morning of June 12, 1947, Ida Dent was killed in the city of Norfolk. Her death resulted from a knife wound inflicted by Winnie Valentine.

The accused was indicted for murder and her first trial on June 24, 1947, resulted in a hung jury. At the second trial on August 18, 1947, a verdict of guilty of involuntary manslaughter was returned and her punishment fixed by the jury at one year in jail. That verdict was approved by the trial court and is before us for review.

A statement of the facts and circumstances attending the homicide is necessary for a correct determination of the questions presented.

The accused and the deceased were negro women who had known each other for some time. There was considerable disparity in their ages, height and weight. Winnie Valentine was 67 years old and five feet in height. She said her weight was about 80 pounds but there is some evidence

that she weighed more. Ida Dent was 60 years old, five feet five inches in height, and weighed 135 to 140 pounds.

The accused had been appointed administratrix of the estate of Sally White, who had owned premises Nos. 1521-23 Calvert Street. This building contained two flats—the downstairs, No. 1523, was occupied by Ida Dent, Georgia Pennington and her husband. The upper flat was occupied by Ida Hawkins to whom it had been rented by the administratrix. That flat had formerly been occupied by Sally White, and Winnie Valentine had certain furniture belonging to Sally White's estate still stored there. As administratrix, she desired to sell this furniture, and on the morning of the homicide went to the premises with a neighbor, Carrie Hardy, who was interested in buying. Her purpose in visiting the premises was to show the furniture to Carrie Hardy, and she also desired to cut some flowers growing in the yard which she intended to take to church services that day.

After the furniture had been inspected, the accused, Carrie Hardy, and Ida Hawkins descended and were standing in the backyard when Ida Dent came out the back door of her apartment.

She said to the accused, "Why don't you speak to me?" The accused replied that on past occasions she had spoken to her (Ida Dent), but as the latter had not replied or responded, she had decided not to speak. No further words were then exchanged between these two, but the accused said to Carrie Hardy and Ida Hawkins, "Come on, let's go up front." These three proceeded along the driveway toward the front of the house. They were, however, followed by Ida Dent. When accused had walked to a point near the front of the house, she stopped to cut some flowers and took from her handbag a small knife ordinarily used by her in sewing and making buttonholes. It had a small detachable blade which protruded three-fourths of an inch from the end of an aluminum handle. She had used it for cutting flowers at this house on a previous occasion. While accused was leaning over cutting the flowers, Ida Dent, who

had approached her, said, "You have got to die and I have got to die." This rather unusual statement may or may not have been made as a threat,—its significance and meaning are not explained. Anyhow accused made no reply thereto. Deceased then said, "I have a good mind to beat you." She immediately undertook to put that threat into execution by striking the accused on the head with her fists. The accused did not immediately strike back. She first undertook to ward off and shield herself from the blows by raising her left arm and then her right arm. Only when the attack continued did she strike back with her clenched fists. This was done by raising her closed hands and striking downward in a similar manner as she was being struck. The uncontradicted testimony of the accused relative to her use of the knife is that when she was first assaulted and struck by the deceased and put up her hands to shield herself, she completely forgot she held in her hand the open knife and if she had been conscious or aware of that fact, she would have thrown it down; nor did she know or realize that Ida Dent had been cut until after the affray was entirely over and her attention was called to some blood on the ground.

It conclusively appears from the agreed statement of facts that she ceased to strike back as soon as deceased desisted from her attack. This affray took place about fifteen feet from the sidewalk in front of the house near a hydrangea bush from which the accused had started to cut some flowers and was of only a few moments duration. When deceased desisted from her attack, the accused picked up her flowers which she had dropped while defending herself, put the knife in her handbag and accompanied by Carrie Hardy, walked back to her home. She had received scratches on her chin, hands, and head, and her hat had been knocked off. She said, and it is uncontradicted, that she was in fear of deceased when attacked, and in view of her assailant's greater size and strength, she was apprehensive of being thrown to the ground where she would be helpless.

Georgia Pennington, who saw part of the affray, and another witness discovered that Ida Dent had been stabbed and took her into the house to administer aid. Police officers were called, and upon their arrival, they found deceased slumped in a chair and very bloody. She was dead upon arrival at the hospital. An autopsy disclosed six wounds —two on the forearm, two on the upper arm, one in the stomach, and one in the chest. The first five were "punctures and superficial." Whether some were inflicted by deceased striking the open knife while accused sought to shield herself or by accused striking back does not appear. The wound in the chest was three inches deep and penetrated the heart. It was argued at the bar of this court by counsel for accused that a wound of such depth, that is, three inches, could not have been made by the small blade unless deceased's chest was deflated at the moment of the infliction of the wound. As there is no contradiction of the length of the blade, this seems to be the only reasonable deduction as to how a wound of such depth was inflicted.

When a police officer went to the home of the accused and told her she was charged with killing Ida Dent, the knife was promptly handed to him, and the first statement she made as to what happened was the same as her testimony in all material particulars.

Several witnesses, some colored and some white, testified to her good character and peaceable disposition.

The several assignments of error may be consolidated and reduced to the two chief grounds relied upon:

1. That the evidence is insufficient to support a conviction for any crime;

2. The court erred in refusing to instruct the jury upon the defendant's contention of self-defense. Four instructions asked for by the accused which presented her claim of self-defense were refused and no instruction was given upon that theory of the case.

On the first trial, one instruction was given on self-defense. Upon the second trial, the same instruction was tendered but refused. From the opinion of the trial judge

which was made a part of the record, it appears that the refusal was based upon the fact that the accused had testified that when attacked "she forgot she had the knife in her hand and that if she had remembered the knife, she would have thrown it down. * * * and that she did not think about the knife at all." The court was of the opinion that this statement conclusively established that the use of the knife was in fact unnecessary and deemed unnecessary by the accused in defense of her person. Yet it should not be lost sight of that in arriving at this factual conclusion, the trial court accepted as true the uncontradicted testimony that she was not aware or conscious of the fact that she held this knife as and when she undertook to defend herself from the attack.

She has been, by the verdict, acquitted of all grades of homicide of a higher degree than involuntary manslaughter. We must, therefore, determine whether the accused can be held guilty of involuntary manslaughter upon the evidence.

"Involuntary manslaughter is the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious act; or in the improper performance of a lawful act." *Mundy* v. *Commonwealth*, 144 Va. 609, 131 S. E. 242.

That she had the right to use such force as was necessary to repel the attack is settled law. In *Dodson* v. *Commonwealth*, 159 Va. 976, at p. 979, 167 S. E. 260, in quoting from *Jackson* v. *Commonwealth*, 96 Va. 107, 30 S. E. 452, it is said:

" * * * 'a person assaulted while in the discharge of a lawful act, and reasonably apprehending that his assailant will do him bodily harm, has the right to repel the assault by all the force he deems necessary, and is not compelled to retreat from his assailant, but may, in turn, become the assailant, inflicting bodily wounds until his person is out of danger.' "

Thus, in merely undertaking to repel the deceased's attack, she was engaged in a lawful act.

The accused contends that as it is an established fact, and so accepted by the trial court in its opinion, that she was unaware of the knife when she undertook to defend herself by striking back, therefore she is not guilty of any crime—in short, her contention is that the killing was an accidental result by misadventure while in the lawful defense of her person, and is therefore excusable homicide.

In *Dodson* v. *Commonwealth, supra,* Chief Justice Campbell explains the difference between justifiable and excusable homicide and in so doing quotes at length from Davis on Criminal Law, pp. 70 through 77. At page 73 of that work, it is said:

"Excusable homicide is of two kinds; either by misfortune or misadventure; or in self-defense. \* \* \*

"Homicide by misfortune or misadventure, is when a man doing a lawful act, and using proper precaution to prevent danger, unfortunately happens to kill another. \* \* \* "

The homicide here dealt with cannot, strictly speaking, be said to have been in self-defense. There was no apparent danger of death or serious bodily harm and therefore no necessity that justified the actual killing. Nor was there any purpose on the part of the accused to take life or inflict serious bodily harm in the defense of her person. The killing does however, in our opinion, fall within the realm of excusable homicide inflicted through misadventure in the lawful repulse of an unjustified attack.

In dealing with a homicide of similar character in *Mundy* v. *Commonwealth, supra,* at page 615, this was said:

"There is not a vestige of evidence in the record to support the conclusion that the accused was engaged in the prosecution of an unlawful act (not felonious), or in the improper performance of a lawful act. Her story of the shooting discloses an unavoidable accident, and one brought about solely by the conduct of the deceased himself."

The distinction between killing in self-defense proper and accidental or unintentional killing while in the exercise of self-defense is set forth in 40 C. J. S., "Homicide", p. 981, sec. 112c. There it is said:

■ "Ordinarily the law of self-defense is not applicable in a case of a killing resulting from an act which was accidental and unintentional, particularly where the facts of the case are not such as would make such law applicable. However, where the defense of excusable homicide by misadventure is relied on, the principles of self-defense may be involved, not for the purpose of establishing defense of self—but for the purpose of determining whether accused was or was not at the time engaged in a lawful act; and it has been held that in such case the right, but not the law, of self-defense is invoked. Accused is entitled to an acquittal where he was lawfully acting in self-defense and the death of his assailant resulted from accident or misadventure, as where in falling he struck or overturned an object and thereby received injuries resulting in his death, or where in a struggle over the possession of a weapon it was accidentally discharged."

See also 26 Am. Jur., "Homicide", p. 305, secs. 220, 221; 13 R. C. L., p. 863, sec. 166.

This principle is also recognized in Wharton's Criminal Law, Vol. 1, 12th ed., secs. 623 and 624. In sec. 624, it is said:

"In other words, when a man kills another in an honest error of fact, murder is out of the question. The only issue is, was this error negligent or non-negligent? If negligent, the killing is manslaughter. If non-negligent excusable homicide."

On page 851, in a footnote to sec. 623, reference is made to the case of *McDermott* v. *State*, 89 Ind. 187, 189, and the synopsis of that case is stated thus:

"The mere fact that the defendant did not, at the time of the killing, believe such killing was necessary does not divest him of the right to set up self-defense if the killing was not intended by him, but was incidental to his excusable defense of himself when assaulted."

In *McDermott* v. *State, supra,* it is said:

"In all cases where the killing of the assailant is purposely

done by the assaulted party, he must have acted under the belief that such killing was necessary to preserve his own life, or to save himself from great bodily harm, to render the killing excusable. We do not mean to say, however, that to render the killing excusable the assaulted party must have acted under the belief that the death of the assailant was necessary. As we have said, in proper cases the assaulted party has the right to meet force with force; and if, in a proper defense, death results to the assailant, the killing may be excusable without a belief on the part of the assaulted party that it was necessary for his own safety. In such cases the defence is purposely made, but the killing is not purposely done. It is simply the result of the defense. *Runyan* v. *State*, 57 Ind. 80 (26 Am. Rep. 52); Whart. Crim. Law, sec. 1019; Hor. & Thomp. Cases on Self-Defence, 492."

In the Treatise on the Law of Crime by Clark and Marshall under the heading, "Homicide by Misadventure", we find in sec. 272, p. 340, the following:

"Excusable homicide *per infortunium*, or by misadventure or accident, is where a person unfortunately kills another in the doing of a lawful act, without any intent to hurt, and without criminal negligence. If a man kills another in doing a *lawful* act in a lawful manner, that is, without negligence, the homicide is excusable, 'for the act is lawful, and the effect is merely accidental.' * * * "

And under the illustration given, it is said that "where a man, lawfully defending himself, unintentionally kills his assailant, the circumstances not authorizing a killing in self-defense", it is nevertheless deemed excusable homicide.

Though it be established that the accused at the time of the killing was engaged in a lawful act, the culpability or lack of culpability is to be determined by the circumstances of the case. The character of the attack made upon her and the manner and means of self-defense exercised are to be considered to determine whether or not the accused was guilty of such negligence or recklessness under the circumstances obtaining as to constitute her action an "improper

performance of a lawful act" and so render her criminally responsible.

The agreed statement of facts and the uncontroverted testimony of the accused, accepted as true by the trial court from the factual recitals in its opinion, conclusively establish that the accused was attacked suddenly without cause. She undertook to shield herself but when the attack continued, instinctively and in self-defense struck her assailant without being aware or conscious of the fact that the small knife was still in her hand. Her reaction was normal and instinctive. The evidence fails to establish negligence or recklessness on her part.

Upon these conclusively established facts, we are of the opinion that the unfortunate result does not constitute the commission of any crime, but is homicide by misadventure in lawful self-defense from an unwarranted attack. The conclusions reached render it unnecessary to consider the other assignments of error.

The judgment of the trial court is therefore reversed and the prosecution dismissed.

*Reversed and dismissed.*