*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-582

DAVON L. PEYTON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-16248-15)

(Hon. Danya A. Dayson, Trial Judge)

(Argued November 18, 2020                    Decided July 21, 2022)

*Stefanie Schneider*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellant.

*Michael E. McGovern*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time, and *Elizabeth Trosman*, *John P. Mannarino*, *Katherine Earnest*, and *Jennifer Fischer*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, *Associate Judge*, and FISHER and THOMPSON, *Senior Judges.*[*]

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of argument.

GLICKMAN, *Associate Judge*:  Early on the morning of November 13, 2015, appellant Davon Peyton shot and killed his friend Ray Harrison after Harrison punched him in the face during a confrontation on the steps of Peyton's apartment building.  A grand jury returned an indictment charging Peyton with second-degree murder while armed,[1] possession of a firearm during a crime of violence,[2] and unlawful possession of a firearm.[3]  At trial, Peyton testified the shooting was an accident that occurred as he was struggling to defend himself from Harrison after being punched.  In light of that testimony, at the government's request, the trial judge instructed the jury on voluntary and involuntary manslaughter[4] as lesser-included offenses of second-degree murder.  The jury acquitted Peyton of second-degree murder and voluntary manslaughter, but found him guilty of involuntary manslaughter while armed.  It also convicted him of the two firearm offenses.

In this appeal, Mr. Peyton presents two claims of instructional error.  First, he argues that the trial judge erred in allowing the jury to convict him of involuntary manslaughter based on the accidental discharge of his firearm while he was using

---

[1]  D.C. Code §§ 22-2103, -4502 (2012 Repl. & 2022 Supp.).

[2]  D.C. Code § 22-4504(b) (2022 Sup.).

[3]  D.C. Code § 22-4503(a)(1) (2022 Supp.).

[4]  D.C. Code § 22-2105 (2022 Supp.).

non-deadly force in self-defense. In such circumstances, appellant contends, accident is a complete defense. We disagree. The trial judge properly instructed the jury that accident is no defense to involuntary, criminal-negligence manslaughter if the defendant's conduct was a gross deviation from a reasonable standard of care that created an extreme risk of death or serious bodily injury. Second, appellant argues that the judge erred by instructing the jury that he could not "rely upon the right of self-defense to justify his use of force" against Harrison if he was the aggressor or if he had reason to believe his actions would provoke Harrison's violence against him. He primarily contends that this instruction does not apply to claims of self-defense in the home. We do not reach the merits of that contention because it would not entitle appellant to relief even if it is correct. Appellant did not rely on self-defense to justify his killing of Harrison, and the jury's finding (which the evidence supported) that appellant was criminally negligent meant the prosecution proved him guilty of involuntary manslaughter regardless of whether he was justified in using non-deadly force to defend himself. The first aggressor/provocation instruction therefore did not prejudice appellant.

## I.    The Evidence at Trial

The tragic events giving rise to this case occurred at around 2:20 a.m. on November 13, 2015, when Ray Harrison drove with his girlfriend and a third person to appellant's apartment building to purchase marijuana from him. Harrison, who had been drinking and was under the influence at the time,[5] had not arranged this visit beforehand. According to his girlfriend, he did not think his showing up unannounced at appellant's apartment so late at night would be "a problem," because he had done it before. Appellant had met Harrison and his girlfriend a few months earlier and had been giving them marijuana in exchange for rides. In his testimony at trial, appellant said he had a "business relationship" with Harrison but also acknowledged they had socialized and were "friends."

Appellant lived in a first-floor apartment with his girlfriend and their seven-year-old daughter. When Harrison arrived, he could not go directly to appellant's apartment to knock on his door because the entrance to the building was locked.

---

[5] A toxicologist at the Office of the Chief Medical Examiner who screened Harrison's blood testified he had a blood alcohol level of .16 grams per 100 milliliters of blood. The toxicologist stated that someone with that blood alcohol level would likely be in an "excited to confused stage," often characterized by exaggerated emotions and impaired perception.

Instead, to get appellant's attention, Harrison banged on one of the windows to appellant's apartment.

Appellant testified that he awoke to a "loud, consistent banging" and feared someone was attempting to break into the apartment through the window in the bedroom where his daughter was sleeping. Grabbing his handgun, which was already loaded, appellant "took the safety off of it" and "cocked it back" so that he could fire it quickly if need be. He then went to the window and looked out. By this time the banging had stopped and appellant saw no one. He did, however, notice a parked car with its headlights on. Appellant then left his apartment with his girlfriend, walked "two steps" to the front door of the building, and opened the door. Standing at the threshold and holding his gun in his right hand at his side, appellant called out, "who is it?" In response, Harrison appeared out of the darkness, identified himself as "Ray," and walked up to appellant at the door. Harrison was alone; his two companions were waiting in the parked car.

Appellant testified that he was "a little relieved" upon seeing Harrison, but he also was confused. He testily asked Harrison why he was "knocking on my daughter's window at two-something in the morning." Harrison answered, "why

you trying to carry me[?]" or "why you carrying me like that?"[6]  Appellant responded dismissively, telling Harrison he was "just my Uber driver," and (as his girlfriend recalled) "we're not friends like that."  According to both appellant and his girlfriend, Harrison did not take appellant's remark well and started punching appellant and pushing his girlfriend aside.  Appellant "tried to push him off," and the cocked pistol, which he was still holding in his right hand, discharged.  A single shot was fired; it hit Harrison in his chest from close range.  Appellant testified he did not mean for the gun to go off; it was an accidental firing as he grappled with Harrison.  All this happened in a matter of seconds.

After being shot, Harrison staggered away and collapsed on the sidewalk. Appellant ran to him, tried to hold his head up and keep him awake, said he was sorry, and repeatedly asked "Why did you do that" or "Why did you come at me?" He yelled for someone to call 911.  After that was done, and before the police or an ambulance arrived, appellant left the scene.  The police arrested him the following week and recovered his gun at that time.

---

[6] Appellant's girlfriend testified that she understood this to mean Harrison felt "disrespected."  Harrison's girlfriend and her friend remained in the car during the entire encounter and did not see what happened between Harrison and appellant. One of them testified that she heard appellant ask Harrison what he was doing knocking at that hour, and that Harrison told him to "calm down."

## II.    The Instruction on Involuntary, Criminal-Negligence Manslaughter

At trial, appellant's defense was that he was lawfully defending himself from Harrison's assault with non-deadly force when the gun he was holding accidentally discharged and fatally wounded Harrison. At appellant's request, the trial judge instructed the jury on his defense as follows:

> The defense contends that Mr. Peyton did not intentionally shoot Mr. Harrison. The defense contends that Mr. Harrison was assaulting Mr. Peyton at the time of the gunshot and that Mr. Peyton was acting in self-defense when the firearm accidentally went off. The defense contends that the Government has not satisfied their burden of proving beyond a reasonable doubt that the firearm did not go off by accident while Mr. Peyton was acting in self-defense.

Appellant contends that the trial judge's instructions relating to the charge of involuntary manslaughter prejudiced this defense by erroneously suggesting that such an accident was not a complete defense to the charge of involuntary manslaughter. Whether the instructions properly articulated what the prosecution needed to prove to convict appellant of involuntary manslaughter is a question of law as to which our review is de novo.[7]

---

[7] *Wilson-Bey v. United States*, 903 A.2d 818, 827 (D.C. 2006) (en banc). The parties dispute whether appellant preserved this claim of error for de novo review,

The judge instructed the jury on what is commonly referred to as involuntary, criminal-negligence manslaughter. As this court explained in *Comber v. United States*,[8] involuntary manslaughter is an "unintentional or accidental" killing committed without justification or excuse.[9] "Unintentional or accidental" is shorthand; the words mean that the killing was not committed (or not proved to have been committed) with the mental state required to prove second-degree murder or voluntary manslaughter, i.e., with an intent to kill or do serious bodily injury, or with a conscious disregard of an extreme risk of death or serious bodily injury.[10] Thus, accident, connoting the absence of such *mens rea*, is generally a defense to murder and voluntary manslaughter.[11] But accident is not per se a defense to *involuntary*

---

but because we conclude the instruction on involuntary manslaughter was legally correct, we need not resolve that dispute.

[8] 584 A.2d 26 (D.C. 1990) (en banc).

[9] *Id.* at 47–48.

[10] *Id.* at 47; *see also id.* at 48-49 (explaining that "the only difference between risk-creating activity sufficient to sustain a 'depraved heart' murder conviction and an involuntary reckless manslaughter conviction lies in the quality of the actor's awareness of the risk"; that "if the actor is aware of the risk, the crime is murder and not involuntary manslaughter," while "[i]f he is not aware [] and he should have been aware, the crime is involuntary manslaughter"; and that "[t]he gravity of the risk of death or serious bodily injury required in each case is the same" (cleaned up; citations omitted)).

[11] *See, e.g.*, *Clark v. United States*, 593 A.2d 186 (D.C. 1991). The defendant in that case was charged with second-degree murder for the killing of one Ms.

manslaughter; rather, it is the possible predicate for such a charge. Under common law principles, "where a person [unintentionally or accidentally] kills another in doing a 'lawful act *in a lawful manner*,' the homicide is excusable"[12] (meaning it does not result in criminal liability). "As this phrase implies, two categories of unintentional [or accidental] killings were *not* excused and thus were manslaughter: killings in the course of lawful acts carried out in an unlawful, i.e., criminally negligent, fashion, and killings in the course of unlawful, i.e., criminal, acts."[13] In this jurisdiction, these two categories of unintentional or accidental homicides have been refined and have evolved into what we refer to as involuntary, criminal-negligence manslaughter and involuntary, misdemeanor manslaughter.

---

Harrison. His defense was that she had pointed a gun at him and it discharged accidentally as he tried to take the gun from her and deflect it from himself in lawful self-defense. This court held that the defendant was entitled to a jury instruction that the prosecution had the burden of proving beyond a reasonable doubt that the killing was not accidental. *Id.* at 194.

[12] *Comber*, 584 A.2d at 48 (quoting W. CLARK & W. MARSHALL, *A Treatise on the Law of Crimes* § 275 (5th ed. 1952)) (emphasis added).

[13] *Id.* (footnotes omitted).

For present purposes, we need only discuss the requirements of the former category of involuntary manslaughter.[14] Under District of Columbia law, the charge of involuntary, criminal-negligence manslaughter incorporates a gross negligence standard to evaluate an unintentional or accidental killing: to secure a conviction the prosecution must prove beyond a reasonable doubt that (1) the defendant caused the death of the decedent, (2) the conduct that caused the death was a gross deviation from a reasonable standard of care; and (3) the conduct that caused the death created an extreme risk of death or serious bodily injury.[15] Ordinarily these three elements "implicitly incorporate[] the absence of excuse element" of involuntary manslaughter, but when there is evidence that the killing may have been justified as having been committed in bona fide self-defense, the trial judge also should instruct

---

[14] Suffice it to say that an unintentional or accidental homicide occurring in the course of a misdemeanor is involuntary manslaughter if (and only if) the misdemeanor is "inherently dangerous" *and* is committed in a manner entailing "a reasonably foreseeable risk of appreciable physical injury." *Id.* at 51. An unintentional killing resulting from a misdemeanor that does not satisfy this standard "will be excused," *id.*, unless it manifests the heightened degree of culpability required to constitute involuntary, criminal-negligence manslaughter. *See id.* at 48.

[15] *See id.* ("[O]ne who unintentionally causes the death of another as the result of non-criminal conduct is guilty of involuntary manslaughter only where that conduct both creates 'extreme danger to life or of serious bodily injury,' and amounts to 'a gross deviation from a reasonable standard of care.'" (quoting *Faunteroy v. United States*, 413 A.2d 1294, 1298-99 (D.C. 1980)); *see also* Criminal Jury Instructions for the District of Columbia, No. 4.212(B) (5th ed. 2020) (colloquially known as the "Redbook").

that "the government must prove beyond a reasonable doubt that the killing was not in self-defense and then define that concept for the jury."[16]

The judge in appellant's trial charged the jury on the elements of involuntary, criminal-negligence manslaughter while armed in accordance with the foregoing principles and with a proper allocation of the burden of proof to the government. In pertinent part, the judge instructed as follows:

> The elements of involuntary manslaughter while armed, each of which the Government must prove beyond a reasonable doubt, are that, one, Mr. Davon Peyton caused the death of Mr. Ray Harrison; two, the conduct that caused the death was a gross deviation from a reasonable standard of care; three, the conduct that caused the death created an extreme risk of death or serious bodily injury; four, Mr. Peyton did not act in self-defense; and, five, at the time of the offense Mr. Peyton was armed with a firearm.
>
> Now, the difference between a required state of mind for second degree murder while armed and involuntary manslaughter while armed is in whether the defendant is aware of the risk. To show guilt of second degree murder the Government must prove that Mr. Davon Peyton was aware of the extreme risk of death or serious bodily injury. For involuntary manslaughter the Government must prove not that he was aware of the risk, but that he should have been aware of it.
>
> Self-defense is a complete defense to murder while armed, voluntary manslaughter while armed and involuntary

---

[16] *Comber*, 584 A.2d at 48-49 n.31.

manslaughter while armed where Mr. Peyton actually believed that he was in danger of serious bodily injury and actually believed that the use of deadly force was necessary to defend against the danger, and both of those beliefs were reasonable.[17]

Appellant argues that these instructions failed to make clear to the jury that his shooting of Harrison was excused so long as it was an accident that happened while he was using non-deadly force to defend himself from Harrison's attack. Appellant asserts that the instructions therefore were "erroneous because accidental discharge of a weapon during a lawful act of self-defense is a complete defense to all grades of homicide, including involuntary manslaughter while armed."[18] But this assertion is not a correct statement of the law of involuntary, criminal-negligence manslaughter as *Comber* outlined it. Appellant leaves out an essential consideration that the trial judge's instructions covered — whether he defended himself in a manner that grossly deviated from a reasonable standard of care and created an extreme risk of death or serious bodily injury. Appellant does not dispute that the evidence at trial permitted the jury to find him grossly negligent in confronting and

---

[17] The judge went on to explicate further the principles of self-defense, including, as we discuss below, the first aggressor/provocation instruction that appellant challenges.

[18] Br. for Appellant at 23-24.

fighting with Harrison while holding in his hand a cocked and loaded handgun with the safety off. It appears the jury did so find.[19] Therefore, even if appellant was entitled to use non-deadly force to defend himself, the jury could find that his accidental shooting of Harrison amounted to involuntary manslaughter. As we have said, although an unintentional killing while doing a lawful act, including an act of self-defense, may not be murder or voluntary manslaughter, *Comber* held that it can be involuntary manslaughter if it is the result of criminal negligence in the performance of that act.

Case law from other jurisdictions supports this conclusion. *Valentine v. Commonwealth*,[20] a leading case from Virginia on which appellant chiefly relies, is instructive on this very point. Ms. Valentine was convicted of involuntary manslaughter. According to the evidence at her trial, she was holding a small knife in her hand while gardening when a woman with an animus against her unexpectedly came upon her and started striking her on the head. After trying to ward off her attacker, Ms. Valentine punched back, concededly unaware in the stress of the

---

[19] In acquitting appellant of second-degree murder and voluntary manslaughter, the jury clearly rejected the government's argument that the shooting was other than accidental.

[20] 48 S.E.2d 264 (Va. 1948).

moment that she was still holding the knife in her hand. In doing so, she accidentally inflicted a fatal stab wound on her assailant.[21] Like appellant in the present case, Ms. Valentine claimed that "the killing was an accidental result by misadventure while in the lawful defense of her person, and is therefore excusable homicide."[22] The Virginia Supreme Court held that in evaluating whether an accidental killing in lawful self-defense amounted to involuntary manslaughter or was excusable, the issue turned on whether the defendant "was guilty of such negligence or recklessness under the circumstances obtaining as to constitute her action an 'improper performance of a lawful act' and so render her criminally responsible."[23] (In Ms.

---

[21] *Id.* at 265–66, 269.

[22] *Id.* at 267.

[23] *Id.* at 268 ("Though it be established that the accused at the time of the killing was engaged in a lawful act, the culpability or lack of culpability is to be determined by the circumstances of the case. The character of the attack made upon her and the manner and means of self-defense exercised are to be considered to determine whether or not the accused was guilty of such negligence or recklessness under the circumstances obtaining as to constitute her action an 'improper performance of a lawful act' and so render her criminally responsible."). Although this quote suggests that negligence or recklessness is the mens rea required to make a killing involuntary manslaughter in Virginia, the standard is essentially one of gross negligence in the District of Columbia. As we recognized in *Comber*, "jurisdictions today differ on the degree of negligence required to render an unintentional or accidental killing involuntary manslaughter." *Comber*, 584 A.2d at 48 n.29. (Recklessness, to the extent it equates to conscious disregard of an extreme risk of death or serious bodily injury, would make the offense second-degree murder in the District of Columbia.)

Valentine's case, the court concluded that the evidence did not establish the requisite degree of negligence or recklessness on her part.[24])

Other authorities likewise reject appellant's contention that accidental use of deadly force during a lawful act of self-defense is a complete defense to involuntary manslaughter regardless of the defendant's lack of care.[25]

Appellant argues that this court approved his theory of defense in *Clark v. United States*.[26] We disagree. *Clark*, a case decided by a division of this court just six months after the en banc decision in *Comber*, did not even mention involuntary manslaughter, nor did it address the standard of care issue now before us or purport to define the contours of an accident defense to involuntary manslaughter (or any

---

[24] *Valentine*, 48 S.E.2d at 269.

[25] *See, e.g.*, *State v. Goodson*, 440 S.E.2d 370, 372 (S.C. 1994) ("For a homicide to be excusable on the ground of accident, it must be shown that the killing was unintentional, that the defendant was acting lawfully, and *that due care was exercised in the handling of the weapon*." (emphasis added)); *Gunn v. State*, 365 N.E.2d 1234, 1238 (Ind. Ct. App. 1977) (including as an element of "the defense of homicide by accident or misadventure" that the act was not "done recklessly, carelessly or in wanton disregard of the consequences"); *see also* 40 C.J.S. Homicide § 180 (2021) ("A homicide is excusable when a defendant accidentally kills while brandishing a weapon in self-defense *if the defendant acted with usual and ordinary caution*." (emphasis added)).

[26] 593 A.2d 186 (D.C. 1991).

other grade of homicide). Rather, the court in *Clark* simply held that a defendant charged with second-degree murder was entitled to an instruction on his theory of defense — that the fatal shooting was an accident when a gun the victim was holding discharged while he was trying to disarm her in self-defense — and that the prosecution had the burden of proving beyond a reasonable doubt that the killing was not accidental.[27]

In sum, under the law of the District of Columbia, whether an accidental killing in the course of lawful self-defense (i.e., the use of non-deadly force to repel an attacker) amounts to involuntary manslaughter turns on whether the killing is the result of criminal negligence (as defined in *Comber*) by the person engaging in self-defense. The burden is on the prosecution to prove such criminal negligence beyond a reasonable doubt. In the present case, we hold the court correctly instructed the jury to apply those principles to appellant's claim that he was trying to protect himself from Harrison's assault when his gun accidentally went off. The court did not err in failing to instruct the jury that accidental discharge of a firearm during a lawful act of self-defense is a complete defense to involuntary manslaughter without regard to the degree of care that was exercised in handling the weapon.

---

[27] *Id.* at 194.

### III.    The First Aggressor/Provocation Instruction

In addressing self-defense as a defense to the homicide charges against appellant, the trial judge instructed the jury on the principle, "well-entrenched in our case law,"[28] that first aggressors and provokers of violence cannot rely on the right of self-defense to justify their use of force.   In accordance with the pattern "Redbook" instruction on the subject, the judge told the jury that:

> If you find that [appellant] was the aggressor or provoked imminent danger of bodily harm upon himself, he cannot rely upon the right of self-defense to justify his use of force.  One who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble cannot claim self-defense.  Mere words without more by [appellant], however, do not constitute aggression or provocation. [29]

Appellant argues that the judge erred in two respects in giving this instruction. First, he claims the evidence at trial was insufficient to support instructing the jury on the possibility that it could find he was the "aggressor" in his encounter with

---

[28] *Andrews v. United States*, 125 A.3d 316, 321 (D.C. 2015).

[29]  Citing *Andrews*, 125 A.3d at 321, the current edition of the Redbook has modified the second sentence to read, "One who knowingly and unnecessarily places himself/herself in a position in conscious disregard of a substantial risk that his/her presence will provoke a violent confrontation cannot claim self-defense." *See* Criminal Jury Instructions for the District of Columbia, No. 9.504 & cmt. (5th ed. 2020).

Harrison. Second, as for provocation, he contends that, as a matter of law, a person (other than the initial aggressor) forfeits a claim of self-defense *in the home* only if he acts with the actual purpose of provoking his adversary into attacking him first — and not (as the instruction stated) if he merely "has reason to believe" his actions will provoke violence. The government disagrees with both contentions. We conclude that even if the instruction was flawed in the respects appellant claims, he was not prejudiced.[30]

The sufficiency of the evidence to support the instruction permitting the jury to consider whether appellant was the initial aggressor is a question of law, as to which our review is de novo.[31] In discussing the proposed instruction with the parties, the trial judge herself expressed the view that there was no evidence that appellant was the first aggressor, as opposed to his having possibly provoked Harrison to violence.[32] It is possible the judge simply overlooked the need to tailor

---

[30] Appellant contends the government has waived any argument that the first aggressor/provocation instruction was harmless by failing to make such an argument in its brief on appeal. However, "as an appellate court, this court has the authority to find trial court error harmless notwithstanding the government's failure to claim harmlessness." *Randolph v. United States*, 882 A.2d 210, 223 (D.C. 2005). We may exercise that discretion when we perceive the lack of prejudice to be "obvious." *Id.*

[31] *Andrews*, 125 A.3d at 321.

[32] The judge stated:

the pattern instruction to omit the reference to finding that appellant was the aggressor.[33]

Nevertheless, any error arising from the inclusion of that reference was harmless, as we have "fair assurance . . . that the judgment was not substantially swayed by the error."[34] We found a similar error harmless in *Garcia v. United States*.[35] There, the trial court "properly and clearly instructed the jury on both involuntary manslaughter and negligent homicide," although the evidence was arguably insufficient to justify giving an instruction on the former charge.[36] We

> [W]hile I might agree that the provocation of imminent danger of bodily harm might be appropriate for the jury to decide . . . , I don't think that there's any evidence in the record thus far that he engaged in a fight. I mean, the provocation might be there. The aggression I don't believe is. I don't think there's evidence of first aggressor rather than provocation.

[33] As explained in the comment to the Redbook Instruction No. 9.504, because aggression and provocation "are distinct legal theories," "there will be times when it is not appropriate to instruct on both."

[34] *Grimes v. United States*, 252 A.3d 901, 919 (D.C. 2021) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). *See Garcia v. United States*, 848 A.2d 600, 602 (D.C. 2004) (applying *Kotteakos* standard of harmlessness to a claim that the prosecution presented insufficient evidence to support instructing the jury on involuntary manslaughter).

[35] 848 A.2d at 600.

[36] *Id.* at 602.

were not persuaded that giving the instruction misled the jury. "Jurors *are* well equipped to analyze the evidence,"[37] we said, "and when a deficient case is presented, jurors usually can be expected to recognize it for what it is."[38]

The same reasoning applies here too. The aggressor instruction was a proper statement of the law; at most, the evidence simply did not support it (though the government disagrees). Absent any indication that the jury was led astray, we assume — as we did in *Garcia* — that it would recognize a deficient case. "Our faith in the jury system would be senseless indeed if we presumed that jurors will be misled by the mere presence of a charge for which sufficient evidence is wanting."[39]

Turning to provocation, the trial judge's instruction encapsulated the "entrenched" (though still much criticized) law in this jurisdiction that "the government is not required to prove that the defendant acted with the intent to

---

[37] *Id.* (quoting *Griffin v. United States*, 502 U.S. 46, 59 (1991)).

[38] *Id.*; *see also Griffin*, 502 U.S. at 59 ("When . . . jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence . . . .").

[39] *Id.*

provoke his adversary to violence."[40]  The rule that "[o]ne who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble cannot claim self-defense" applies, this court has held, even if the defendant's purpose is "benign," and even if the confrontation is in a "place where the defendant had a right to be present."[41]  The justification for this strict rule is based on "the fundamental principle that a killing in self-defense is excusable only as a matter of genuine necessity."[42]

Appellant argues that this court has never applied this strict rule to a claim of self-defense where the defendant was threatened with an intrusion *in his home*, and he advances some cogent reasons for qualifying the rule and holding that one does not forfeit the right of self-defense in the home by confronting an intruder there

---

[40] *Andrews*, 125 A.3d at 322 (citing *Sams v. United States*, 721 A.2d 945, 952 (D.C. 1998)).  As we said in *Andrews*, the District of Columbia appears to be an "outlier in not requiring proof of intent to incite violence as a component of its provocation doctrine," but "it not open to a division of this court to adopt [that requirement] in contravention of governing precedent." *Id.* at 322 n.13.

[41] *Id.* at 322 (citing *Sams*, 721 A.2d at 953, and *Mitchell v. United States*, 399 A.2d 866, 869 (D.C. 1979)).  This court has yet to grapple with the many troublesome implications of this interpretation of provocation.

[42] *Id.* (quoting *United States v. Peterson*, 483 F.2d 1222, 1231 (D.C. Cir. 1973)).

unless one does so with the purpose to provoke violence.[43] We readily acknowledge that a home invasion may threaten immediate danger, and that an occupant faced with such a threat in the confines of his home may have or perceive no reasonable alternative to confrontation. On the other hand, even if we might be inclined to adopt appellant's proposed rule that one does not forfeit the right of self-defense by confronting a home intruder unless one's purpose is to provoke violence, it is questionable whether such a rule would apply to appellant's benefit in the circumstances of this case. For it is undisputed that appellant did *not* confront Harrison in his home; instead, he deliberately chose to risk precipitating a violent encounter outside it. He armed himself, left his apartment, opened the secure front door of the building, and stood on the threshold in order to confront a potentially dangerous adversary lurking somewhere in the vicinity. A jury reasonably could find that appellant was not compelled to take that risk because he had another reasonable option — he could have stayed inside his locked apartment and called the police if he believed someone was trying or had tried to burglarize his home. It

---

[43] Appellant also argues that the rule he espouses is mandated by the Supreme Court's decision overturning a murder conviction in *Beard v. United States*, 158 U.S. 550 (1895). The *Beard* Court involved a defendant who confronted intruders on his property, and the Court noted the evidence did not support an instruction given the jury that one who intends to provoke an "affray" or "difficulty" leading to violence cannot claim self-defense. *Id.* at 558. It is less clear whether the Court meant in *Beard* to set forth a "purpose-based" standard for forfeiture of self-defense by provocation, either in the home or elsewhere.

thus is not clear that any special instruction on provocation "in the home" would have been appropriate on these facts.

In any event, though, even if the trial judge erred by instructing the jury that appellant could not rely on self-defense to justify his use of force if he put himself in a position where he had reason to believe his presence might provoke trouble, the error did not prejudice appellant. The putative error was harmless under any standard because appellant did not rely on self-defense to justify his fatal shooting of Harrison (nor does he claim he would have been justified in employing deadly force to repel Harrison's use of non-deadly force against him[44]).

Appellant argues that the provocation instruction helped the prosecution prove he had forfeited his right to use non-deadly force to protect himself against Harrison's assault. But as we have explained, the charge of involuntary manslaughter required the prosecution only to prove Harrison's *killing* was not justified by the right of self-defense. The charge did not require the prosecution to prove appellant forfeited his right, or otherwise was not entitled, to use non-deadly

---

[44] *See, e.g., Ewell v. United States*, 72 A.3d 127, 131 (D.C. 2013) ("[W]here an accused, claiming self-defense, uses deadly force, he must — at the time of the incident — actually believe and reasonably believe that he is in imminent peril of death or serious bodily harm; whereas one utilizing non[-]deadly force must show that he reasonably believed that harm was imminent." (quotation marks and citation omitted)).

force in self-defense. The jury's finding of appellant's gross negligence — a finding supported by the evidence, as appellant does not dispute — meant the prosecution proved him guilty of involuntary manslaughter even if there was no forfeiture and he was justified in defending himself with non-deadly force. Appellant does not argue that the provocation instruction influenced the finding of gross negligence, and we see no reason to think it did. The instruction therefore did not prejudice appellant.

## III.

For the foregoing reasons, we affirm appellant's conviction of involuntary manslaughter while armed.