COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Malveaux and Raphael

DANENE ADE STOKES

v.      Record No. 1400-23-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE STUART A. RAPHAEL
NOVEMBER 12, 2024

FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Robert H. Morrison, Judge

(Joseph A. Sanzone; Sanzone & Baker, L.L.P., on brief), for appellant.

(Jason S. Miyares, Attorney General; Justin B. Hill, Assistant Attorney General, on brief), for appellee.

Danene Stokes appeals her involuntary-manslaughter and related firearms convictions, arguing that the "castle doctrine" entitled her to use deadly force to repel a former boyfriend who forcibly entered her home. But Stokes fails to describe the evidence in the light most favorable to the Commonwealth. Based on that evidence, the jury could find beyond a reasonable doubt that Stokes invited the victim into her home for a consensual sexual encounter and then recklessly shot and killed him. We therefore dispense with oral argument and affirm the judgment, finding the appeal to be "wholly without merit." Code § 17.1-403(ii)(a); Rule 5A:27(a).

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

It is undisputed that Stokes shot and killed Tyree Bailey in her home sometime between 5:30 p.m. and 7:30 p.m. on December 26, 2021. It is also undisputed that she shot him with a 9mm handgun that she kept in a dresser in her bedroom. Stokes claims that she accidentally shot Bailey while trying to repel him after he forcibly entered her home. The Commonwealth maintained that Stokes invited Bailey into her home after proposing that he come over for a sexual encounter, after which she accidentally but recklessly shot and killed him.

Stokes's brief describes the relevant facts in a one-sided manner that fails to credit the Commonwealth's evidence. But we must take the facts in the light most favorable to the Commonwealth, the party that prevailed at trial. *Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc). "Doing so requires that we 'discard' the defendant's evidence when it conflicts with the Commonwealth's evidence, 'regard as true all the credible evidence favorable to the Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

### A. *Stokes and Bailey's relationship*

Stokes and Bailey had been in a complicated relationship for years before December 2021, having been friends and, at times, romantic partners. Stokes lived in Halifax County. But from August through the beginning of December that year, she visited Bailey five or six times at his home in Virginia Beach, where she would stay for several days at a time, sleeping with him in his bedroom. They also shared a bedroom together in a hotel suite later that month. But by Christmas time, Stokes was principally dating Avery White (whom she called "Luv"). Even so,

---

[1] The Hon. Kimberley Slayton White briefly participated in this case in the trial court. Subsequently elected to this Court, Judge White took no part in the consideration or resolution of this appeal.

Stokes and Bailey regularly texted one another, wavering back-and-forth between arguing and flirting.

For Christmas, Bailey and his daughter drove to visit his mother, who also happened to live in Halifax. On Christmas Eve, Bailey texted Stokes: "I told you me or him [White] and you made your choice . . . . I'm not doing this anymore!!" But Stokes texted back: "I don't want him. He's [an] asshole." The two texted one another throughout the night and into the next day.

*B. The shooting*

On December 26, Bailey borrowed Stokes's truck to transport a TV stand to his mother's house. There were also other texts and seven phone calls between Bailey and Stokes that day.

At the same time, Stokes was quarreling by text with White. Stokes was angry that White would not leave his family's home to visit her. She texted White at 4:00 p.m. that she "want[ed] [her] pussy ate & to fuck." They continued to argue by text for the next half hour. Stokes texted, "I WANT what I WANT. Ain't no sidelining me." She accused him of treating her as "second," saying "I'm not doing that shit no MF MORE. [F]uck all that shit! Enjoy yaself."

At 4:43 p.m., Stokes texted Bailey, "I definitely need this pie ate." Bailey quickly replied, "I got that . . . I'm ready." Two minutes later, Stokes texted White that she expected him "TO BE ON DEMAND AND COMMAND." A minute later, she texted Bailey to "[c]ome over," telling him that her daughter had left the house. Stokes told Bailey, "Bring me some food." Bailey responded, "Ok, I just got out of the shower[,] I'm coming."

At about 5:00 p.m., Bailey left his mother's house for Stokes's house—a 30-minute drive.[2] What happened after he got there is disputed. At 7:38 p.m., however, Stokes called 911

---

[2] While Bailey was on his way to see Stokes, Stokes resumed texting White. White said that he was going to come over to Stokes's that night. A little after 6:00 p.m., Stokes told White

- 3 -

and reported that Bailey had broken "into [her] house and [she] had to shoot him." She exclaimed that Bailey had "been harassing her" and that he rushed in, so she "got scared" and shot him. Throughout the 911 call, Stokes repeatedly said that Bailey was still breathing.

When the police arrived, Stokes ran out of her house shouting, "I shot him, I shot him, I shot him." Entering the home, police found Bailey on the kitchen floor, lying on his left side in a pool of blood. Bloody shoeprints were "everywhere" in the kitchen, especially "around the . . . body." Police also saw a mop in the kitchen sink, which contained lukewarm water smelling of bleach. A bottle of bleach and rubber gloves were right next to the sink. There were also rags "covered in blood" on the kitchen floor next to Bailey's body.

When emergency medical technicians arrived around 7:50 p.m., they determined that Bailey had been dead for "a while." Bailey's blood had started to form "good clots" on the floor, and his fingers had begun to stiffen. Another officer noticed that the blood on the floor had started to "congeal."

Executing a search warrant a short time later, police asked Stokes for her clothes and her cellphone, which she turned over after changing into other clothes. But Stokes had a second phone, an iPhone, which she tried to conceal. Police spotted the iPhone and confronted her. She turned that phone over too.

An autopsy determined that Bailey died from a bullet that entered his head near his nose and exited the top of his head with a slight "left to right" trajectory. Police found a damaged bullet on the living-room carpet, and Stokes had gunshot residue on her hand. The bullet left a ricochet mark in the ceiling.

---

to let her know when he was ready to come over. An hour later, Stokes sent a final text to White, saying she was playing a game and asking White what he was doing.

As the police investigated the scene, Stokes sat in one of the police cars.[3] She spoke with investigators for more than 40 minutes. Stokes said that she and Bailey had been friends for "a very long time." "For a brief period," they had a relationship, but they had broken up "two, almost three years" before. Stokes said she had started to date someone else, whom Bailey was not "keen on." But she said that she and Bailey had agreed to remain friends.

Stokes acknowledged that she and Bailey had been texting all day. She told the investigator that she had invited Bailey over. She claimed, however, that when Bailey arrived, he was "disgruntled." She said he was aggravated that Stokes would not date him. Stokes said she kept her screen door locked and told him to leave. But Bailey ignored her and pulled the screen door, "busting" it open and pushing her aside as he entered her house. While inside, the argument "managed to fall into [Stokes's] bedroom." When Bailey wouldn't leave, Stokes got her weapon from her bedroom dresser. Back in the kitchen, Bailey "grabbed" Stokes, like going for "a bear grab." Stokes said that her gun "just went off."

Police found "no evidence of any kind of damage at all" to the screen door. There were no scratches, bends, or any signs of pressure exerted on the door or the frame. Officers also attempted to "manipulate" the door while it was locked but found no "faulty mechanism."

### C. Stokes's interview days later

When police returned to Stokes's residence three days later, she revised her account somewhat. Stokes said that when she returned to the kitchen from the bedroom, she placed the firearm on the kitchen table while continuing to speak to Bailey. Bailey then approached her with his arms up and grabbed her, so Stokes picked up the gun from the table and it "went off."

---

[3] Although the police did not arrest Stokes, they read her *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966).

Stokes said that her finger was on the trigger because "nine times out of ten," if a gun is in somebody's hand their finger would be on the trigger.

Stokes insisted that there was no sexual intimacy or anything other than friendship between them. She said that Bailey "misled" people to believe that they were in a relationship. Stokes denied sending Bailey anything "provocative" or doing anything to "entice" Bailey into thinking she would engage in sexual activity with him that evening. Police pressed Stokes on texts that she sent to Bailey and trips that they made together. Stokes maintained that she and Bailey were merely friends who often helped each other, and she said that White knew about this arrangement.

### D. The trial

Stokes was arrested a week later and charged with involuntary manslaughter and three firearms offenses.[4] At the jury trial that followed, the Commonwealth introduced many days' worth of text messages between Stokes and Bailey and between Stokes and White. The jury received Stokes's videotaped interviews with police, body-camera footage from responding officers showing the crime scene, an audio recording of Stokes's 911 call, and testimony from more than ten witnesses.

The defense moved to strike the Commonwealth's evidence, arguing that Stokes was permitted to use lethal force against Bailey under the "castle doctrine." The defense argued that Bailey, a trespasser, assaulted Stokes when he entered, justifying her use of reasonable force to make him leave. The defense also claimed that the prosecution failed to prove that Stokes intentionally discharged the gun.

---

[4] The firearms charges were unlawful discharge (Code § 18.2-279), brandishing (Code § 18.2-282), and reckless handling of a firearm (Code § 18.2-56.1).

The trial court denied the motion to strike and Stokes's renewed motion to strike at the close of evidence. The court found several factual questions for the jury to resolve, including whether Bailey permissibly entered Stokes's home. The trial court, however, granted Stokes's proposed jury instruction on the castle doctrine:

> [I]f you believe from the evidence that the altercation in the defendant's home which ultimately resulted in the death of the deceased, was started by the deceased acting aggressively and that the accused, whether in fear for her safety or not, endeavored to remove the deceased from her home by reasonable force according to the circumstances as they appeared to her and the deceased was shot and killed in that occurrence, then you shall find the accused not guilty.

The jury found Stokes guilty of involuntary manslaughter, brandishing, and reckless handling of a firearm.[5] Stokes was sentenced to 10 years' incarceration for involuntary manslaughter (with 8 years and 3 months suspended) and to 12 months (all suspended) on each firearm conviction. Stokes noted a timely appeal.

ANALYSIS

Stokes argues that the trial court should have struck the prosecution's case, both under the castle doctrine and because there was no dispute that the gun discharged accidentally. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The only 'relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

---

[5] The Commonwealth nolle prossed the unlawful-discharge indictment.

*Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

### A. Castle Doctrine (Assignment of Error I)

"A person's right to defend himself in his own home has strong roots in this Commonwealth." *Lienau v. Commonwealth*, 69 Va. App. 254, 264 (2018). The "castle doctrine" was passed down from "our forefathers [who] were compelled to protect themselves in their habitations by converting them into holds of defense." *Fortune v. Commonwealth*, 133 Va. 669, 687 (1922) (quoting 1 Joel Prentiss Bishop, *New Commentaries on the Criminal Law Upon a New System of Legal Exposition* § 858, at 517 (8th ed. 1892)). "[T]he dwelling house was called the castle." *Id.* Within one's castle, the resident "may exercise all needful force to keep aggressors out, even to the taking of life." *Id.*; *Hines v. Commonwealth*, 292 Va. 674, 681 (2016) (same); *Lienau*, 69 Va. App. at 275 ("[A] homeowner has the right to 'meet force with force' when an intruder breaks into his or her home." (quoting *Valentine v. Commonwealth*, 187 Va. 946, 954 (1948))). "If while lawfully preparing to defend himself in his home, the homeowner accidentally kills the intruder, he still may be entitled to acquittal on the grounds of self-defense" because "'the killing is not purposely done. It is simply the result of the defense.'" *Lienau*, 69 Va. App. at 275 (quoting *Valentine*, 187 Va. at 954).

Our Supreme Court recently applied the castle doctrine in *Hines*. The victim there was intoxicated, "extremely belligerent," and "out-of-control" in Hines's home. 292 Va. at 677. Seeing that the victim had a gun, Hines fetched his own gun from another room and returned. *Id.* A shootout ensued, leaving the victim dead. *Id.* The Supreme Court held that because the victim was "brandishing a weapon in Hines' own home, . . . Hines exercised his right to defend himself, his family, and his home with appropriate force." *Id.* at 681. Hines was not required to retreat, even though he had removed himself from the threat of danger by walking into another room.

*Id.* The Court said that "when a party assaults a homeowner in his own home, as in this case, the homeowner has the right to use whatever force necessary to repel the aggressor." *Id.* at 679-80 (citing *Fortune*, 133 Va. at 687).

But the castle doctrine has limitations. "One may waive the protection of his castle by permitting another to enter"; and "[i]f a man enters another's dwelling house peaceabl[y] on an implied license, he cannot be ejected except on request to leave, followed by no more than the necessary and proper force, even though misbehaving himself therein." *Fortune*, 133 Va. at 687 (quoting Bishop, *supra*, § 859, at 518).

The jury here was instructed that it must find for Stokes if the jury "believe[d] from the evidence that the altercation . . . was started by [Bailey] acting aggressively and that [Stokes], whether in fear for her safety or not, endeavored to remove [Bailey] from her home by *reasonable force* according to the circumstances as they appeared to her." (Emphasis added.) That instruction is now the law of the case. *E.g.*, *Babbitt v. Miller*, 192 Va. 372, 378 (1951) ("There being no assignment of error directed to the giving and refusing of instructions, those given became the law of the case, and are binding upon us, irrespective of their correctness.").

Stokes argues that she was assaulted by Bailey after he barged in through the front door, so she was justified in using force to repel the assault. She says that there is "[u]nusually good evidence" establishing that this assault occurred: her "wailing and crying" when police arrived— which were excited utterances probative of the truth—and her testimony that Bailey refused to leave when she told him to.

But Stokes's brief ignores the mountain of evidence that contradicted her version of events. That evidence sufficed for the jury to find beyond a reasonable doubt that Stokes recklessly shot and killed Bailey after inviting him inside, thereby not using "reasonable force" (in the language of the jury instruction) to defend her home.

To start, Stokes told the 911 operator that Bailey had been harassing her and had forced his way into her house. She told Investigator Burton that Bailey had "made threats" to her, "pulled the screen open" when it was locked, and "forced his way in."

But Stokes's text messages showed that she invited him over for a sexual encounter after she had grown frustrated with White for not coming over to have sex with her. Bailey would have arrived around 5:30 p.m., yet Stokes did not call 911 until 7:38 p.m. Thus, the jury could have reasonably rejected Stokes's claim that he entered her home uninvited. Indeed, police inspected and tested the screen door, finding no evidence of any forced entry.

Similarly, the jury could properly find that Stokes lied to police when she told them that she had not spent the night with Bailey for several years. Stokes claimed that she had not dated him since 2019 and had "tried to minimize any level of interaction" that would involve "a couple situation." But Bailey's 19-year-old daughter testified that Stokes visited her father's house 5 to 6 times in the past couple months and that Stokes and Bailey slept together in his bedroom. They had done so as recently as the first week of December. And Stokes had also shared a bed with Bailey in a hotel suite later that month.

Although the defense supports its assault theory by arguing that Bailey's blood-alcohol content was 0.095, exceeding the legal limit to drive a car, the jury could have found from the evidence that Bailey and Stokes had consumed alcohol together before she shot him.[6] Bailey's daughter testified that, when he left for Stokes's house at 5:00 p.m., Bailey did not smell of alcohol and showed no signs of impairment. Moreover, the medical examiner who measured the alcohol differential between Bailey's blood and eye fluid testified that Bailey had only "very recently consumed alcohol."

---

[6] Stokes's statements on this point were equivocal. She told Burton at one point that Bailey "had been drinking." At another point, she said she didn't know if he had been drinking and claimed that they did not drink together.

The jury could also reasonably find that Stokes recklessly handled the gun, resulting in the accidental shooting that killed Bailey. Stokes said that she did not intend to shoot Bailey; she did so accidentally when he tried to put his arms around her. She said she intended only to scare him to get him to leave, but the gun "just went off." Indeed, she told Investigator Burton two days later that Bailey "had no intention to harm me." Those admissions supported the prosecution's criminal negligence theory.

Other evidence buttressed the prosecution's theory as well. Although Stokes said that she normally keeps the safety engaged on the gun, the safety was switched off, an act that required manual manipulation. The forensic investigator testified that, with the safety off, it would have required six-and-a-half to eight pounds of pressure to pull the trigger. When asked if she had her finger on the trigger when she shot Bailey, Stokes admitted that "nine times out of ten," a person would place a finger on the trigger when picking up the gun.

The jury could also find that Stokes falsely claimed that she called 911 as soon as the gun went off. The call log admitted into evidence showed a 33-second call from her phone to White's phone just before she called 911. And the mop, bleachy water, gloves, and bloody footprints traversing the floor strongly suggested that Stokes had prepared to sanitize the crime scene before calling 911.

Stokes's effort to conceal her iPhone when investigators executed the search warrant also evidenced her consciousness of guilt. As we said in *Langhorne v. Commonwealth*, 13 Va. App. 97 (1991), "it is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *Id.* at 102 (quoting *United States v. Ballard*, 423 F.2d 127, 133 (5th Cir. 1970)). The iPhone yielded extensive evidence of Stokes's text messages with Bailey, impeaching her claim that he had barged into

her house uninvited, and discrediting her denial of their romantic relationship. Stokes's effort to conceal the iPhone shows that she knew it contained damaging evidence against her.

In short, the instruction on the castle doctrine told the jury to determine whether Stokes "endeavored to remove the deceased from her home by reasonable force." Even crediting Stokes's claim that she asked Bailey to leave, there was ample evidence for the jury to find that Stokes did not use "reasonable force" in doing so.

### B. Accidental Discharge (Assignment of Error II)

Stokes also argues that the trial court erred in failing to strike the prosecution's evidence because "it is uncontroverted that the gun discharged in this case accidentally when it was jostled by the actions of the deceased." Whether the gun discharged accidentally is not an element of the offense of brandishing a firearm. *See* Code § 18.2-282(A) ("It shall be unlawful for any person to point, hold or brandish any firearm . . . in such manner as to reasonably induce fear in the mind of another."). Nor is it an element of the reckless-handling charge. *See* Code § 18.2-56.1(A) ("It shall be unlawful for any person to handle recklessly any firearm so as to endanger the life, limb or property of any person."). Thus, we consider this argument only as it relates to Stokes's conviction for involuntary manslaughter.

"Involuntary manslaughter . . . requires a showing of criminal negligence." *Bryant v. Commonwealth*, 67 Va. App. 569, 578 (2017), *aff'd*, 295 Va. 302 (2018). "'Criminal negligence' is judged under an objective standard and may be found to exist where the offender either knew or should have known the probable results of her acts." *Bryant*, 295 Va. at 310 (quoting *Riley v. Commonwealth*, 277 Va. 467, 483-84 (2009)). Criminal negligence can be defined "in terms of gross negligence"—an act "'showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the

knowledge of, the probable result of his acts.'" *Id.* (quoting *Riley*, 277 Va. at 484). The Commonwealth is not required to prove, however, "that the discharge of the firearm was not accidental." *Id.* at 311. In other words, "proof of accidental or inadvertent discharge" is *not* a defense. *Id.* at 308.

Taking the evidence in the light most favorable to the Commonwealth, the jury had sufficient evidence from which to find beyond a reasonable doubt that Stokes acted with criminal negligence in handling the gun so recklessly that she shot and killed Bailey. The jury could properly find that, after manually switching off the safety, Stokes picked up the gun, put her finger on the trigger, pointed the gun at Bailey's head from about 12 inches away, and pulled the trigger with at least 6½ pounds of pressure, thereby shooting Bailey in the face and killing him. Stokes admitted to police that she intended only to scare Bailey, not to shoot him. Crediting that admission, the jury could reasonably find that Stokes was grossly negligent in handling the gun. As *Bryant* shows, the fact that the defendant shoots the victim accidentally does not absolve her of criminal negligence. While Stokes claims that Bailey caused the weapon to fire accidentally when he went to "bear hug" her, the jury was free to discredit her account in light of her demonstrably false statements to the police. The "fact-finder, having rejected [the] defendant's attempted explanation as untrue, [could] draw the reasonable inference that [her] explanation was made falsely in an effort to conceal [her] guilt." *Maust v. Commonwealth*, 77 Va. App. 687, 703 (2023) (en banc) (quoting *Covil v. Commonwealth*, 268 Va. 692, 696 (2004)).

CONCLUSION

In sum, we find no basis to set aside Stokes's convictions.

*Affirmed.*

- 13 -